IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| In re: | |
| DANTRA HEALTHCARE, INC., et al.,[1] | Chapter 11 |
| Debtors. | Case No. 13-35419 |
| | Jointly Administered |

**DECLARATION OF DANA P. TATE IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS OF
DANTRA HEALTHCARE, INC., AND RELATED ENTITIES**

I, Dana P. Tate, being duly sworn, deposes and say:

1.      I am the President and Chief Executive Officer of DANTRA Healthcare, Inc.,

("DANTRA") the above-captioned Debtor and Debtor-in-Possession.  DANTRA is the parent

company of Southpointe OBGYN, LLC ("Southpointe"), also a Debtor and Debtor-in-

Possession.

2.      I am the President and Chief Executive Officer of S. A. Medical of Virginia, Inc.

("S. A. Medical"), also a Debtor and Debtor-in-Possession.  S. A. Medical is the parent company

of King George Medical Center, Ltd., d/b/a King George Medical Center d/b/a Gateway Medical

---

[1]      The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include:  DANTRA Healthcare, Inc. (8010); S. A. Medical of Virginia, Inc. (7167); King George Medical Center, Ltd. (6801); and Southpointe OBGYN, LLC (5938).  The location of the Debtors' service address is: 125 Olde Greenwich Dr, Ste 160 Fredericksburg, Virginia 22408.

Robert S. Westermann (VSB No. 43294)
Rachel A. Greenleaf (VSB No. 83938)
HIRSCHLER FLEISCHER, P.C.
The Edgeworth Building
2100 East Cary Street
Post Office Box 500
Richmond, Virginia 23218-0500
Telephone:      804.771.9500
Facsimile:      804.644.0957
E-mail:  rwestermann@hf-law.com
         rgreenleaf@hf-law.com

*Proposed Counsel for the Debtors
and Debtors-in-Possession*

Urgent Care d/b/a King George Pediatrics ("King George"), also a Debtor and Debtor-in-Possession.

    3.    DANTRA, S. A. Medical, King George, and Southpointe are the Debtors and Debtors-in-Possession (the "Debtors") in these Chapter 11 cases.

    4.    I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtors, and I am authorized to submit this Declaration on behalf of the Debtors.

    5.    On October 7, 2013 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") and the motions described herein (collectively, the "First Day Motions") in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court").

    6.    The Debtors remain in possession of their assets and continue to manage their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

    7.    No trustee or examiner has yet been appointed in these cases, and no committee has yet been appointed or designated.

    8.    The Debtors have filed or anticipate filing the following motions and applications (collectively, the "First Day Motions"):

    a.    Motion of the Debtors for Entry of an Order Setting Expedited Hearing on "First Day Motions" and for Related Relief

    b.    Motion of the Debtors for an Order Directing Joint Administration of Their Related Chapter 11 Cases

    c.    Motion of the Debtors Pursuant to 11 U.S.C. § 521 and Fed. R. Bankr. P. 1007(C) Requesting an Extension of the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules

of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs

d.   Motion of the Debtors for Entry of an Order (A) Authorizing but Not Directing the Debtors to Pay Certain Pre-Petition (I) Wages, Salaries, and Other Compensation, and (II) Employee Benefits; and (B) Authorizing and Directing Financial Institutions to Honor All Related Checks and Electronic Payments Related to the Foregoing; and (C) Related Relief

e.   Motion of the Debtors for Interim and Final Orders (I) Authorizing the Use of Cash Collateral; (II) Granting Adequate Protection; and (III) Scheduling a Final Hearing

f.   Motion of the Debtors for an Order Authorizing (I) Maintenance of Existing Bank Accounts; (II) Continued Use of Existing Cash Management System; and (III) Continued Use of Existing Business Forms

g.   Motion of the Debtors Pursuant to 11 U.S.C. §§ 105, 351, and 363, for Entry of an Order Authorizing the Winding Down of the King George Medical Center, Ltd., and Related Relief and Memorandum in Support Thereof

9.   I have reviewed and am familiar with the contents of each of the First Day Motions, and I believe that the approval of the relief requested therein is necessary to minimize disruption to the Debtors' business operations so as to permit an effective transition into Chapter 11, preserve and maximize the value of the Debtors' estates, and, ultimately, achieve a successful restructuring.

10.   I am submitting this Declaration in support of the Debtors' First Day Motions. Capitalized terms used but not defined in this Declaration shall have the meanings set forth in the relevant First Day Motion.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtors' operations and financial condition, and information provided to me by management, advisors, employees, or other representatives of the

Debtors.  If I were called as a witness, I would testify consistently with the facts set forth in this Declaration.

11.     This Declaration provides an overview of the Debtors and the circumstances leading to the commencement of these Chapter 11 cases.  Section I provides an overview of the Debtors' businesses and operations.  Section II recounts the events preceding the bankruptcy filings.  Section III affirms and incorporates facts that support the First Day Motions.

## I.      **Overview of the Debtors' Businesses**

12.     A diagram outlining the structure of the Debtors' businesses is attached as **Exhibit A**.

### A.      **DANTRA Healthcare, Inc. ("DANTRA")**

13.     DANTRA is a corporation organized under the laws of Virginia.  DANTRA was created for the sole purpose of being the parent company of acquired practices and partner-owned medical practices.  DANTRA is the parent company for Southpointe.  DANTRA holds no assets and has no employees.  I, Dana P. Tate, and Tracy Tate own 100 percent of DANTRA.  DANTRA does not have any employees.

### B.      **S. A. Medical of Virginia, Inc. ("S. A. Medical")**

14.     S. A. Medical is a corporation organized under the laws of Virginia.  S. A. Medical is a medical administrative services corporation providing clients with, inter alia, practice management, credentialing, consulting, and billing services.  S. A. Medical is the parent company of King George Medical Center, Ltd., and Hippo Health Medical Staffing, Inc..  I, Dana P. Tate, and Tracy Tate own 100 percent of S. A. Medical.

15.     S. A. Medical currently employs approximately thirty-seven (37) people on a full-time basis, nine (9) people on a salaried basis, and five (5) people on a part-time basis.

4

### C.   Southpointe OBGYN, LLC - Subsidiary of DANTRA

16.     Southpointe OBGYN, LLC ("Southpointe") is a limited liability company organized pursuant to the laws of Virginia.  Southpointe is an obstetric and gynecologic private medical practice located in Spotsylvania County, Virginia.   Southpointe is a partner-owned practice.   Ownership of SouthePointe is divided as follows:  DANTRA owns 37.5 percent, Virginia OBGYN Partners own 37.5 percent, and Mary Washington Healthcare Holding Company owns 25 percent.   Southpointe's operations and the majority of its assets were transferred to HCA Physicians on September 9, 2013, pursuant to an asset purchase agreement. Southpointe does not have any employees.

### D.   King George Medical Center, Ltd. - Subsidiary of S. A. Medical

17.     King George Medical Center, Ltd. ("King George") is a corporation organized under the laws of Virginia.  King George is a multi-specialty private medical practice located in King George, Virginia.  King George has three practice locations, where it does business as King George Medical Center; Gateway Medical Urgent Care; and King George Pediatrics.   King George is a Q subsidiary of S. A. Medical.  S. A. Medical owns 100 percent of King George.

### E.   Overview of the Debtors' Financial Obligations

18.     Southpointe, S. A. Medical, and DANTRA are the borrowers of several loans, each of which contains guarantees by other debtors and insiders.

19.     A diagram outlining each loan obligation is attached as **Exhibit B**.

#### 1.     Southpointe Loans

20.     On February 10, 2010, Southpointe received a loan from Virginia Partners Bank in the original principal amount of $175,000.00 (the "February 2010 SP Loan").  The February 2010 SP Loan appears to be secured by a blanket lien on all of Southpointe's assets.   The

February 2010 SP Loan was guaranteed by DANTRA, Virginia OBGYN Partners, LLC, Tracy M. Tate, Dana P. Tate, Kurian Thott M.D., Lia D. Shorter M.D., S. A. Medical, and Women's Health & Surgery Center, Inc. As per a demand letter from Virginia Partners Bank dated August 21, 2013, the payoff of the February 2010 SP Loan was $80,440.94. However, recent correspondence from Virginia Partners Bank states that the February 2010 SP Loan is now marked paid in fall.

21.    On December 23, 2011, Southpointe received a commercial line of credit increase from Virginia Partners Bank in the original principal amount of $450,000.00, which is payable on demand (the "December 2011 SP Loan"). The December 2011 SP Loan appears to be secured by a blanket lien on all of Southpointe's assets. The December 2011 SP Loan was guaranteed by S. A. Medical, Tracy M. Tate, Dana P. Tate, Kurian Thott, M.D., Lia D. Shorter, M.D., Women's Health and Surgery Center, LLC, DANTRA, Virginia OBGYN Partners, LLC, Mary Washington Healthcare Holding Company, and Mary Washington Healthcare. As per a demand letter from Virginia Partners Bank dated August 21, 2013, the payoff of the December 2011 SP Loan was $454,985.95.

22.    On September 10, 2012, Southpointe received a secured line of credit loan from Mary Washington Healthcare in the original principal amount of $200,000.00 (the "September 2012 SP Loan"). The September 2012 SP Loan appears to be secured by a blanket lien on all of Southpointe's assets. There were two groups of guarantors on the September 2012 SP Loan. Each group agreed to unconditionally guarantee up to 37.5 percent of the September 2012 SP Loan. The first group of guarantors consists of S. A. Medical, DANTRA, Dana P. Tate, and Tracy M. Tate (the "First Group"). The second group of guarantors consists of Women's Health and Surgery Center, Inc., Virginia OBGYN Partners, LLC, Kurian Thott, M.D., and Lia D.

Shorter, M.D.  The current amount outstanding on the September 2012 SP Loan is $200,000.00.

As per recent correspondence with Mary Washington Healthcare, the First Group is liable for

$77,804.18, with interest accruing daily at 5 percent per annum and attorney's fees.

### 2.    S. A. Medical Loans

23.    On December 12, 2008, S. A. Medical received two loans from Stellar One Bank.

The first loan was in the original principal amount of $125,000.00 (the "First December 2008 SA

Loan").  The First December 2008 SA Loan matured on December 12, 2010.  This loan appears

to be secured by a blanket lien on the corporate assets of S. A. Medical.  Tracy M. Tate

guaranteed the First December 2008 SA Loan.  There was a $114,018.49 disbursement in

payment of the First December 2008 SA Loan by a later, August 14, 2011, loan from Stellar One

Bank.  It is unclear whether that disbursement paid the First December 2008 SA Loan in full or

whether there is some outstanding balance.

24.    S. A. Medical received another loan from Stellar One Bank on December 12,

2008 (the "Second December 2008 SA Loan"), which was in the original principal amount of

$75,000.00.  The Second December 2008 SA Loan also matured on December 12, 2010.  This

lien appears to be secured by a blanket lien on the corporate assets of S. A. Medical.  There are

no guarantees for the Second December 2008 SA Loan.  There was a $74,866.20 disbursement in

payment of the Second December 2008 SA Loan by a later, August 14, 2011, loan from Stellar

One Bank.  It is unclear whether that disbursement paid the Second December 2008 SA Loan in

full or whether there is some outstanding balance.

25.    On April 14, 2011, S. A. Medical received a loan from Stellar One Bank in the

original principal amount of $638,065.23 (the "April 2011 SA Loan").  The April 2011 SA Loan

is secured by a lien on S. A. Medical's inventory, chattel paper, accounts, equipment, and

general intangibles. On August 14, 2012, S. A. Medical and Stellar One Bank entered into a modification agreement of the April 2011 SA Loan (the "August 2012 SA Loan"). Pursuant to the terms of the August 2012 SA Loan, the new principal balance was $551,737.50. It appears that this loan is secured by a lien on S. A. Medical's inventory, chattel paper, accounts, equipment, and general intangibles. The August 2012 SA Loan is guaranteed by DANTRA and Tracy M. Tate. The outstanding loan balance on the August 2012 SA Loan is approximately $473,303.09.

### 3.    DANTRA Loans

26.    On October 28, 2009, DANTRA received a loan from Stellar One Bank in the original principal amount of $40,000.00 (the "October 2009 DANTRA Loan"). The October 2009 DANTRA Loan will mature on October 28, 2014. The October 2009 DANTRA Loan is secured by a lien on DANTRA's inventory, chattel paper, accounts, equipment, and general intangibles. There are no guarantees of the October 2009 DANTRA Loan. The outstanding loan balance on the October 2009 DANTRA Loan is approximately $11,290.56.

27.    On April 14, 2011, DANTRA received a loan from Stellar One Bank in the original principal amount of $24,818.03 (the "April 2011 DANTRA Loan"). The April 2011 DANTRA Loan will mature on October 14, 2016. The April 2011 DANTRA Loan is secured by a lien on DANTRA's inventory, chattel paper, accounts, equipment, and general intangibles. The outstanding balance on the April 2011 DANTRA Loan is approximately $14,148.84.

### F.    Regulatory Agencies

28.    The health care industry nationwide is heavily regulated by various state and federal agencies. Each state has a different regulatory regime in this area. As corporate entities operating in the Commonwealth of Virginia, the Debtors are regulated by the Virginia State

Corporation Commission. As S. A. Medical, DANTRA, and Southpointe do not provide medical services, these Debtors are not subject to additional regulation. Upon information and belief, King George Medical Center is not subject to additional regulations, although its physicians and medical practitioners may be.

II.    **Events Leading to the Chapter 11 Cases**

29.    Due to the variety of cross-guarantees discussed previously, financial strain on any one of the Debtors has had immense negative effect on the finances of the other successful Debtor entities. One Debtor's failure to make payments on guaranteed loan obligations has negatively impacted other Debtors' financial condition.

30.    Medical billing services are the overwhelming source of revenue for S. A. Medical.

31.    S. A. Medical is scheduled to lose a large client at the end of 2013. The client represents approximately one-half of S. A. Medical's revenue and over one-half of its medical billing services expenses, but there are many opportunities on the horizon.

32.    The practices of King George are all located in a rural county with a population of approximately 26,000 residents. The practices have encountered difficulties in the recruitment and retention of medical providers due to its locations.

33.    King George suffered from financial losses. Attempts to reduce overhead and to produce profitability have failed.

34.    For the King George practices, the payor mix has shifted from favorable in 2011 to unfavorable in 2013, due to an increase in Medicaid and Medicaid HMO.

35.    The King George practices encountered difficulties transitioning to electronic medical records ("EMR"). Even further after transitioning to its second EMR system in 2012, the

EMR company ceased servicing the EMR, forcing the King George practices to yet again change to a new system at tremendous costs.

36.    King George's deteriorating financial condition has caused it to currently be unable to pay its vendors.  As such, the vendors have discontinued providing necessary services and supplies to King George, necessitating the Debtors' decision to orderly wind down the King George practices.

37.    Medical billing services have also financially supported King George's shortfalls for many years, providing income of approximately $25,000 to $45,000 monthly, but that income cannot support the business.

38.    Due to Southpointe's deteriorating financial condition, the three partners of Southpointe (DANTRA, Virginia OBGYN Partners, and Mary Washington Healthcare Holding Company) made the decision to sell the assets and to shift the practice operations to HCA Physicians ("HCA").  HCA began operations on September 9, 2013.  As a result of the sale to HCA, Virginia Partners Bank received the proceeds of the sale (approximately $80,000).

39.    Despite the payment of the sale proceeds, outstanding debt remains with Southpointe's lending institutions, Virginia Partners Bank and Mary Washington Healthcare.  In partial payment of the debt, Virginia Partners Bank will also receive the funds contained in Southside's bank account and the proceeds of open accounts receivables.  The estimated amount of accounts receiveables is approximately $100,000.00.

40.    Through these Chapter 11 cases, the Debtors intend to restructure by (1) selling Southpointe and shutting down King George; (2) streamline existing operations; (3) reject certain unexpired leases and executor contracts; and (4) reorganize around S. A. Medical, a profitable business.

III.    **Facts in Support of First Day Motions**

      A.    **Motion of the Debtors for Entry of an Order Setting Expedited Hearing on "First Day Motions" and for Related Relief (the "Expedited Hearing Motion")**

41.    The Debtors request that the Court set an expedited First Day Hearing for October 8, 2013, at 2 P.M. (prevailing Eastern Time), or as soon thereafter as counsel may be heard, to consider the First Day Motions described below.  In addition, the Debtors request that the Court deem the Debtors' Notice of First Day Hearing to be adequate and appropriate notice under the circumstances.

42.    I believe that the relief requested in the Expedited Hearing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest.  Prompt entry of the relief requested in the First Day Motions is critical to maintaining the Debtors' ongoing operations and preserving the value of their estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the Expedited Hearing Motion should be approved.

      B.    **Motion of the Debtors for an Order Directing Joint Administration of Their Related Chapter 11 Cases (the "Joint Administration Motion")**

43.    The Debtors request entry of an Order directing joint administration of the Chapter 11 cases for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket for all of the Chapter 11 cases under the case of DANTRA. The Debtors also request that an entry be made on the docket of each of the Debtors' Chapter 11 cases, other than DANTRA, to reflect the joint administration of the Chapter 11 cases.

44.    Given the integrated nature of the Debtors' operations, I believe that joint administration of the Chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party-in-interest. Many of the motions, hearings,

and orders that will arise in the Chapter 11 cases will jointly affect all of the Debtors.  Joint

administration will also reduce fees and costs by avoiding duplicative filings and objections, and

will allow the United States Trustee and all parties-in-interest to easily monitor these Chapter 11

cases.

45.    I believe that the relief requested in the Joint Administration Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable

the Debtors to continue to operate in the ordinary course without disruption. Accordingly, on

behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be

approved.

        **C.**      **Motion of the Debtors Pursuant to 11 U.S.C. § 521 and Fed. R. Bankr.
P. 1007(C) Requesting an Extension of the Time to File Schedules of
Assets and Liabilities, Schedules of Current Income and
Expenditures, Schedules of Executory Contracts and Unexpired
Leases, and Statements of Financial Affairs (the "Schedules and
SOFAs Motion")**

46.    In the Debtors' Schedules and SOFAs Motion, the Debtors request that the Court

enter an Order (i) extending the time by which the Debtors must file their schedules and

statements until the 45th day after the Petition Date; and (ii) authorizing the United States

Trustee to schedule the Section 341 Meeting after the forty-day deadline imposed pursuant to the

Bankruptcy Rules.

47.    Given the substantial burdens already imposed on the Debtors' management by

the commencement of these Chapter 11 cases, the Debtors' management requires additional time

to complete the schedules and statements required under the Bankruptcy Code in the time frame

provided by the Bankruptcy Rules.  In an attempt to preserve the estates, the Debtors'

management, not paid professionals, are preparing the statements and schedules.  Absent an

extension of time, to complete the schedules and statements would require the diversion of the

Debtors' attention from business operations at a critical time. I believe that "cause" exists to extend the deadline, through and including the 45th day following the Petition Date, as such term has been explained to me by the Debtors' legal professionals. I also believe that the Debtors recognize the importance of the schedules and statements in these Chapter 11 cases and that they intend to complete the schedules and statements as quickly as possibly under the circumstances.

48.     I believe that the relief requested in the Schedules and SOFAs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules and SOFAs Motion should be approved.

> **D.    Motion of the Debtors for Entry of an Order (A) Authorizing but Not Directing the Debtors to Pay Certain Pre-Petition (I) Wages, Salaries, and Other Compensation, and (II) Employee Benefits; (B) Authorizing and Directing Financial Institutions to Honor All Related Checks and Electronic Payments Related to the Foregoing; and (C) Related Relief (the "Wages Motion")**

49.     In the Wages Motion, the Debtors request entry of an Order to: (a) authorize, but not direct, the Debtors to pay certain pre-petition (i) wages, salaries, and other compensation, (ii) employee medical and similar benefits, and (iii) other miscellaneous employee expenses and benefits; and (b) authorize and direct financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payments requests relating to the foregoing.

50.     The Debtors provide the following wages and benefits to their employees:

     i.    Wages, salaries, and other compensation;

     ii.   Employee benefits;

     iii.  Workers' compensation;

     iv.   Payroll taxes and other withheld amounts;

     v.    Annual and sick leave.

51.      The Debtors' employees are essential to an orderly and successful reorganization. They have an intimate knowledge of the operation of the Debtors' businesses and any deterioration in employee morale and welfare at this critical time undoubtedly would adversely impact the Debtors, the value of their assets and businesses, and ultimately their ability to reorganize. Accordingly, I believe that the ability to compensate the Debtors' employees in the ordinary course of business is critical to the Debtors' reorganization efforts.

52.      In addition, I underatnd that all unpaid, pre-petition compensation is entitled to priority treatment in accordance with section 507(a)(4) of the Bankruptcy Code in light of the fact that none of the Debtors' employees are owed more than $11,725 in unpaid compensation.

53.      Furthermore, pursuant to state laws, the Debtors must maintain their workers' compensation obligations to ensure prompt and efficient payment and/or reimbursement of their employees. If the Debtors fail to maintain such obligations, they will likely be prohibited by state law from operating in the state. As a result, I believe that payment of all amounts related to the Debtors' workers' compensation obligations is crucial to the continued operation of its business.

54.      For these reasons, and for the reasons and legal arguments set forth in the Wages Motion, I submit that the Wage Motion should be approved.

        **E.**      **Motion of Debtors for Interim and Final Orders (I) Authorizing the Use of Cash Collateral; (II) Granting Adequate Protection; and (III) Scheduling a Final Hearing (the "Cash Collateral Motion")**

55.      In the Cash Collateral Motion, the Debtors request the entry of the Interim Order and the Final Order (i) authorizing the use of cash collateral, (ii) granting adequate protection and related security interests, and (iii) scheduling a final hearing pursuant to Bankruptcy Rule 4001(b).

56.    In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their working capital and liquidity needs.  In addition, the Debtors require cash on hand to fund these Chapter 11 cases while seeking to reorganize their businesses.  Post-petition use of the Cash Collateral is necessary in order for the Debtors to preserve sufficient liquidity to maintain ongoing day-to-day operations and fund their working capital needs.  Due to the nature of the Debtors' businesses and the impact that a prolonged bankruptcy would have on the Debtors and their clients, it is imperative that the Debtors have the necessary cash on hand to put forth a plan of reorganization as quickly as possible.

57.    Stellar One Bank has a security interest in the deposit accounts, cash, and cash proceeds (the "Cash Collateral") of S. A. Medical and DANTRA.  Virginia Partners Bank and Mary Washington Healthcare have security interests in the Cash Collateral of Southpointe, to the extent that such Cash Collateral still exists.  Upon information and belief, King George's assets are unencumbered.  The Debtors have an emergency need for the immediate use of Cash Collateral to effectively and expeditiously manage these Chapter 11 cases.  Absent the use of Cash Collateral, the Debtors will not have any funds and will lack the ability to ensure ongoing operations of its business.

58.    The Debtors have submitted with the Cash Collateral Motion a proposed interim order granting the relief requested and permitting the use of Cash Collateral (the "Interim Order").  Attached to the Interim Order is a detailed operating budget for the use of the Cash Collateral (the "Budget").

59.    I believe that the relief requested in the Cash Collateral Motion is in the best interests of the Debtors, their estates and their creditors, and absent such relief, the Debtors will experience immediate and irreparable harm and their reorganization efforts will be jeopardized.

          **F.**     **Motion of the Debtors for an Order Authorizing (I) Maintenance of Existing Bank Accounts; (II) Continued Use of Existing Cash Management System; and (III) Continued Use of Existing Business Forms (the "<u>Cash Management Motion</u>")**

60.     In the Cash Management Motion, the Debtors seek entry of an order granting the following relief:

      (a)     Authorizing the Debtors to continue to use their Cash Management System, subject to any modification or other relief granted by order of this Court relating thereto, including the following:

           1.     the continued use of their existing Bank Accounts with the same names and account numbers as such Bank Accounts existed immediately prior to the Petition Date (with the option of streamlining its Cash Management System by closing or consolidating Bank Accounts in accordance with the terms and conditions of the existing account and service agreements);

           (ii)     the ability of the Debtors to deposit funds into and withdraw funds from any of their Bank Accounts (subject to available funds or, in the case of zero balance accounts, subject to the availability of funds in the applicable linked funding accounts) by all usual means, including but not limited to checks, wire transfers, electronic funds transfers, and other debits;

           (iii)     the ability of the Debtors to otherwise treat their Bank Accounts, along with any accounts opened post-petition, for all purposes as debtor-in-possession accounts;

           (iv)     the waiver of any requirements to establish separate accounts for cash collateral and/or tax payments; provided, however, that accounts pledged or serving as collateral for pre-petition obligations shall be maintained as such;

           (v)     authorizing and directing the Banks to maintain, service, and administer such deposit accounts, without interruption and in the ordinary course of business, in accordance with applicable non-bankruptcy law and the account agreements and/or other service documentation between the applicable Bank and the Debtors relating to such accounts; and

     (vi)    authorizing the Banks to charge and collect, and authorizing, but not directing, the Debtors to pay, the pre-petition and post-petition service charges and other fees and expenses to which the Banks are entitled under the terms of their account agreements and/or other service documentation with the Debtors; and

    (b)    Authorizing the Debtors to continue to use their existing business forms without alteration or change; provided, however, that, once the Debtors have depleted their existing stock of checks, the Debtors shall order new checks with the "debtor in possession" designation.

61.    I believe that by using the existing Bank Accounts, the Debtors will avoid unnecessary expense and delay, which will disrupt the ordinary financial affairs and business operations of the Debtors, delay the administration of the Debtors' estates, and increase the costs to the estates.

62.    Prior to the Petition Date and in the ordinary course of business, the Debtors maintained a cash management system through which funds from clients were collected into a provider account and disbursed to various other accounts to pay operating expenses as well as to pay the medical providers (the "Cash Management System").

63.    The Cash Management System is used to fund the Debtors' day-to-day operations, including payroll, employee benefits, payments to vendors, and other accounts payable.

64.    As of the Petition Date, the Debtors have active bank accounts (the "Bank Accounts") at Virginia Partners Bank and Stellar One Bank (the "Banks"). Specifically, Southpointe has a checking account at Virginia Partners Bank. DANTRA has a checking account at Stellar One Bank. S. A. Medical has three checking accounts at Stellar One Bank. King George has a checking account at Stellar One Bank.

65. In addition to the Cash Management System and the Bank Accounts, the Debtors use, in the ordinary course of its business, numerous business forms (including but not limited to checks, deposit slips, letterhead, contracts, purchase orders and invoices). The Debtors have a supply of these forms on hand. It would be expensive and wasteful, and disruptive to the Debtors' business to destroy all of these forms and order new ones.

66. I believe that the relief requested in the Cash Management Motion will help to ensure the Debtors' orderly entry into and administration in Chapter 11 and avoid many of the possible disruptions and distractions that could divert the Debtors' attention from more pressing matters during the initial days of these Chapter 11 cases.

> **G.** **Motion of the Debtors Pursuant to 11 U.S.C. §§ 105, 351, and 363 for Entry of an Order Authorizing the Winding Down of the King George Medical Center, Ltd., and Related Relief and Memorandum in Support Thereof (the "Wind Down Motion")**

67. In the Wind Down Motion, the Debtors seek entry of an order authorizing the winding down of the King George Practices and approving of the disposal of patient records in accordance with section 351 of the Bankruptcy Code.

68. Over the past year, according to the Debtors' profit and loss statements, King George experienced a net loss of ($111,698.33). The Debtors project that King George's expenses will exceed income by over $50,000 for the month of October 2013 alone.

69. I believe that the closure of the King George practices is in the Debtors' sound business judgment and will benefit the Debtors' estates, creditors, and parties-in-interest. King George has been operating at a substantial loss for an extended period of time. The continuance of the King George practices will only hinder the Debtors' restructuring efforts and continue to diminish the financial condition of the other Debtors.

70.     Because King George is operating at such a deficit, the Debtors cannot afford to maintain the patient records for six years, as required by the Virginia Code.   Therefore, the Debtors request that they be allowed to retain the patient records for one year and then dispose of any unclaimed patient records in accordance with section 351 of the Bankruptcy Code.

71.     Although I believe that the closure of the King George practices will be beneficial to the estates, I recognize that closure may be a sensitive issue, in light of concerns over the patients.   The Debtors will provide notice to the patients that the King George practices will be closing in thirty (30) days.   The notice will further provide that the patients should schedule any necessary visits, refill any prescriptions, and receive any other goods and services within that thirty-day period.   The notice will also provide that the patients have one year to request their patient records; any patient records that are not claimed will be destroyed.   The Debtors will also provide notice of the closure of the King George practices in a local newspaper, in accordance with Virginia law.

72.     King George will provide requested patient records to patients, upon appropriate request, in a reasonable manner.   Upon request, King George will also provide referrals to patients for other, operating health care businesses in the vicinity.

73.     I believe that a quick closure of the King George practices is necessary to prevent any further diminishment of the Debtors' estates and to benefit the interests of creditors and parties-in-interest.   I attempted to sell the King George practices pre-petition with no success; I am continuing those efforts post-petition to try to finds a buyer to take over the practice. Accordingly, the Debtors request the Wind Down Motion be effective upon entry.

**IV.     Conclusion**

74.     For all the foregoing reasons, I respectfully request that the Court grant the relief requested in the First Day Motions.

75.     I reserve the right to supplement and/or amend this Declaration with testimony and/or exhibits.

76.     I declare under penalty of perjury that the foregoing is true and correct.

*[Remainder of Page Intentionally Left Blank]*

Dated: October 7, 2013

By:    Dana P. Tate

Title:    President

## EXHIBIT A

**Current Corporate Structures**

## Current Corporate Structures

## S. A. Medical of Virginia, Inc.



**Current Corporate Structures**

**DANTRA Healthcare, Inc.**



## EXHIBIT 2

**Loan Obligations and Corresponding Guarantees**

## Loan Obligations and Corresponding Guarantees

